**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JERMAINE SMITH**, | |
| Plaintiff, | Civil Action No. 16-7633 (ZNQ) (TJB) |
| v. | **OPINION** |
| **STEPHEN D'ILIO, et al.**, | |
| Defendants. | |

**QURAISHI, District Judge**

Presently before the Court are two unopposed Motions for Summary Judgment. The first motion is brought by Administrator Stephen D'Ilio ("D'Ilio"), Lieutenant Joseph Bundy ("Bundy"), Sergeant Sean Patterson ("Patterson"), Sergeant Michael Anderson ("Anderson"), Senior Corrections Officer ("SCO") Jason Mallette ("Mallette"), SCO Leonard Bonanno ("Bonanno"), SCO Daniel Bell ("Bell"), SCO Robert Collins ("Collins"), and SCO Pietro Cupo ("Cupo") (collectively "State Defendants") (ECF No. 138). The second motion is brought by Doctor Abu Ahsan ("Ahsan") and Nurse Joseph Rakoczy ("Rakoczy") (collectively "Medical Defendants"). (ECF No. 142.) Both sets of Defendants seek dismissal of Plaintiff Jermaine Smith's ("Plaintiff") Verified First Amended Complaint ("FAC"), which alleges that Defendants violated Plaintiff's civil rights under 42 U.S.C. § 1983 and New Jersey state law. (ECF No. 35.)

For the reasons explained below, State Defendants' Motion for Summary Judgment is granted in part and denied in part. The Court **denies** summary judgment on the excessive force and failure to intervene claims against Patterson, Mallette, Bell, and Collins. The Court also **denies**

summary judgment on the First Amendment retaliation claim against Anderson arising from the disciplinary charges he filed against Plaintiff in February 2015. The Court otherwise **grants** State Defendants' Motion for Summary Judgment. With respect to Medical Defendants' Motion for Summary Judgment, the Court **denies** summary judgment on the Eighth Amendment deliberate indifference claims against Nurse Rakoczy and **grants** summary judgment on the Eighth Amendment deliberate indifference claims against Defendant Dr. Ahsan.

## I.    FACTUAL BACKGROUND & PROCEDURAL HISTORY

### a.  The Parties

Plaintiff is a convicted state prisoner currently incarcerated at New Jersey State Prison ("NJSP") in Trenton, New Jersey, where he has been serving a sentence since 2006. (ECF No. 153; FAC, ¶¶ 1, 8, 24; Deposition of Jermaine Smith ("Pl. Dep."), 9:1–16 (Ex B).)

During the relevant timeframe, D'Ilio was the administrator of NJSP. (ECF No. 75, State Defs.' Am. Answer, ¶ 9.) Patterson was employed by the New Jersey Department of Corrections ("NJDOC") as a sergeant at NJSP. (*Id.* ¶ 10.) Bundy was employed by the NJDOC as a lieutenant at NJSP. (ECF No. 14, State Defs' Original Answer at ¶ 10.) Collins, Bell, Mallette, Bonanno, Anderson, and Cupo were employed by the NJDOC as corrections officers at NJSP. (State Defs.' Am. Answer, ¶¶ 12, 13, 15, 17, 18, 20.)

During the relevant time period, Ahsan was a medical doctor employed by Rutgers, the State University of New Jersey ("Rutgers"). (Ahsan Answer, ¶ 21.) Rakoczy was a registered nurse employed by Rutgers and assigned to NJSP. (Rakoczy Am. Answer, ¶ 22.)

### b.  Plaintiff's History of Filing Grievances and Complaints Against Corrections Officers

In his deposition, Plaintiff testified that he was transferred from NJSP to East Jersey State Prison in 2008 after he complained about an incident with a corrections officer but was transferred

back to NJSP in 2011. (Pl. Dep. 9:1–16.) Plaintiff further testified that at some point after his return to NJSP, Bundy recognized him in the rotunda area and called him over. (*Id*. at 61:10–22.) According to Plaintiff, "[t]hat's when [Bundy] informed the other officers" that "Smith is back and he is a problem person. He always want to be pope prisoner, he want to be a paralegal." (*Id*. at 61:10–25; 62:2–3.) Bundy warned the other officers to "watch out" for Plaintiff. (*Id*.; *see also* FAC, ¶¶ 27–28.) According to the Amended Complaint, Bundy subsequently instigated a "campaign of harassment against him." (FAC, ¶¶ 29, 31.)

Plaintiff testified about a 2012 incident involving Bundy and Anderson. On or around December 19, 2012,[1] Plaintiff had an argument with Anderson in the mess hall about whether Plaintiff was entitled to a vegetarian diet. (Pl. Dep. 62:6–16.) Thereafter, Bundy and Anderson ordered officers to search Plaintiff's cell seven times. According to Plaintiff, "[t]he officer said they couldn't find anything, Bundy . . . went in with one of his officers, fabricated a shank[2] [and] one of his officers planted it in [Plaintiff's] cell. That's when [Plaintiff] got locked up [and he] went to administrative segregation unit for over a year." (*Id*. at 62:6–25; 63:1–5; *see also* 87:17–24 (stating that Bundy placed shanks in his cell).) In another incident on June 28, 2014, Patterson allegedly wrote false disciplinary charges against Plaintiff for misusing authorized medicine and forging a signature on a remedy form. (*Id*. at 98:19 to 99:18.)

As explained below, Plaintiff alleges that from September 2014 through February 2015, State Defendants subjected him to unconstitutional conditions of confinement, excessive force,

---

[1] In his FAC, Plaintiff indicated that this incident occurred "[o]n or about September or October of 2013." (FAC, ¶ 31.) During his deposition, Plaintiff clarified that the incident occurred in December 2012. (Pl. Dep. 62:6–12; 63:6–10.)

[2] "Shank" is a slang term for a homemade knife. *See* Merriam Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/shank (last visited June 23, 2025).

and false disciplinary charges.  (*See* FAC, ¶¶ 33–81.)  Plaintiff also contends that he filed more than 22 grievances and complaints during this time period.  (*Id.* at ¶ 110.)

### c.  Plaintiff is Housed in a Cell with Standing Water, Mold, Mildew, and Mice Droppings

Plaintiff testified that in mid-September 2014, he was transferred to what he calls a "condemned" cell that flooded with over an inch of water when it rained, was "covered with mold and mildew," had mice droppings all over the floor, and had no running water.  (FAC, ¶ 33; Pl. Dep. 65:15–18, 70:1–4.)  Plaintiff testified that he referred to the cell as condemned "upon information and belief" because "all the inmates and officers were saying" that Cell 29 was "condemned."  (Pl. Dep. 64:20-65:5.)  Plaintiff further testified that "after [he] was getting harassed by the officers, they deliberately put [him] in that cell being malicious, put me in that cell just trying to make me miserable, and they know [Plaintiff] was asthmatic."  (*Id.* at 65:6–20.) Plaintiff also testified that Cell 29  "had mold on the wall and it had mice droppings all over the floor and yeah—mice droppings, smell like mold and [Plaintiff] can't be around that stuff."  (*Id.*) Plaintiff remained in Cell 29 for "over a few months." (*Id.*)

Plaintiff testified that he has been asthmatic since birth and is on the chronic care list for treatment.  (*Id.* at 11:1–25; *see also* ECF No. 168, State Defendants' Statement of Undisputed Material Facts ("SSUMF") ¶ 30.)  Plaintiff further testified that he suffered from breathing problems and asthma flareups that required medical treatment as a result of exposure to the mice droppings and his allergies to fur and animals.  (*Id.* at 66:1–67:4.)  Plaintiff also testified that he is allergic to certain animals.  (*Id.* at 66:14–25, 67:1–4 ("Q: How do you know that your breathing problems came from the mice droppings? A: It's dirty, it's dirty, it's rats, it's fur. I'm allergic to that stuff.").)  According to Plaintiff, an unidentified doctor wrote a report and told him that exposure to rodents, insects, and "all that" caused his respiratory symptoms.  (*Id.* at 67:5–12.)

Plaintiff testified that "several doctor[s]" told him that "being in a cell that has mold on the wall, mice droppings and rat running around can cause [him to have] respiratory problems . . ." (*Id*. at 69:2–7.)  Plaintiff could not provide the names of a specific doctor, however, and stated that he had to look at his medical reports.  (*Id*. at 68:16–19.)  State Defendants note that Plaintiff has not provided an expert report or expert testimony to support his claim that the conditions in his cell caused his breathing problems.  (SSUMF ¶ 35.)

Plaintiff alleges in his FAC that he complained to Defendants Collins and Cupo and asked to speak with a supervisor about concerns with his exposure to mold and mildew, but Defendants refused his request.  (FAC, ¶ 34.)  According to Plaintiff, Collins was responsible for the conditions of the prison.  (Pl. Dep. 91:12–18.)  And Cupo put him in the cells that were not in "livable condition."  (*Id*. at 91:24–25.)  Plaintiff concedes, however, that none of the cells were in what he considered to be "livable condition."  (*Id*. at 92:1–10.)

Plaintiff also seeks to hold then-prisoner administrator D'Ilio responsible for his cell conditions.  He testified that D'Ilio "is the individual that makes sure that every—every place in that prison is run accordingly, it's running well. And he failed to do so."  (*Id*. at 86:24–25; 87:1–4.)  In the FAC, Plaintiff contends that D'Ilio was "aware of the issues" with his prison cells because Plaintiff filed "in excess of 22 institutional grievances and complaints," as well as several letters to various administrative staff.  (FAC, ¶ 110.)

Throughout October and November 2014, Plaintiff allegedly filed complaints with prison administration and contacted the ombudsman about the conditions in his cell.  (*Id*. ¶ 35.)  On November 4, 2014, Plaintiff spoke with a NJSP social worker and gave him a tour of his cell.  (*Id*. ¶ 36.)

Plaintiff also testified that on November 7, 2014, he went to the clinic and received medical treatment after he had an asthma attack and became "violently ill," which he attributes to his cell conditions. (Pl. Dep. 74:17–24.) Plaintiff was returned to his cell after receiving several shots and respiratory treatments. (*Id*. at 74:17–24.) On or about November 17, 2014, Plaintiff sought further treatment from a triage nurse who gave him two respiratory treatments and admitted him to the infirmary. (*Id*. at 75:10–24.)

The following day, Plaintiff was moved to Cell 9. (*Id*. at 75:25 to 76:2; FAC, ¶ 39.) Plaintiff testified that Cell 9 also had mice droppings, but he conceded that all the cells had mice droppings and that he was not the only prisoner housed in a cell with mice droppings. (Pl. Dep. 75:25-76:13.) Plaintiff also testified that he had been in the majority of the cells at NJSP and that Collins and Cupo placed him in the "worst cell that there is" to retaliate against him. (*Id*. at 77:19–25; 78:1–7.)

### d. Denial of Running Water in his Cell and Food on Certain Occasions

In his FAC, Plaintiff also alleges he was housed in several prison cells, including Cells 29 and 9, that did not have running water. (FAC, ¶¶ 33, 36, 40, 43, 103.) Plaintiff was moved to Cell 9 on or around November 18, 2014. (*Id*. ¶¶ 39–40.) Plaintiff testified that "they turned my water off when [he] got put in [Cell 9]" and when he pressed the faucet, only "little drops of water came out" rather than "running water." (Pl. Dep. 70:1–15; *see also* SSUMF ¶ 24 (emphasizing Plaintiff's admission that water dripped out of the faucet).) Plaintiff allegedly complained to Cupo and Collins about the lack of running water, but they failed to address the situation. (FAC, ¶ 40.)

Plaintiff testified that as he was going to the recreation yard on November 20, 2014, he noticed Defendant Anderson at the officer's desk and complained to him about the lack of water in his cell. (Pl. Dep. 76:14–23.) He told Anderson that he had been without water for more than

a week.  (FAC ¶ 41.)  Plaintiff testified that Anderson replied, "[d]o us all a favor and die."  (Pl. Dep. 76:18–23.)

Around November 27, 2014, Plaintiff complained to the assistant ombudsman about the lack of running water, and the fact that he had not been able to clean his hands for ten days.  (FAC, ¶ 43.)  As a result of his complaints, Plaintiff contends that Collins and Cupo removed him from Cell 9 and placed him in Cell 34 "all the way in the back of the tier."  (*Id*. ¶ 44.)

In the FAC, Plaintiff also alleged that during a two-week period from November 30, 2014 through December 15, 2014, he filed complaints about the staff failing to provide his meals.  (*Id*. ¶ 45.)  In his deposition, Plaintiff initially testified that he went as long as four days without food, but he clarified that staff on certain shifts did not feed him:  "Listen, all right, the shift I was having problems with[,] they the ones that didn't feed me.  I didn't say that I never got nothing to eat."  (Pl. Dep. 70:18 to 71:24; *see* SSUMF ¶¶ 25-27 (pointing to Plaintiff's testimony that he was not fed on certain shifts).)  Subsequently, Plaintiff testified that he went as long as two days without food during the two-month period he was in Cell 9, and he later estimated that he went two days without food on four occasions while housed in Cell 9, but did not provide any specific dates.  (*Id*. at 71:25 to 72:24.)  According to Plaintiff, on these occasions, unnamed officers either did not give Plaintiff food, or they threw his tray on the floor, rendering the food inedible.  (*Id*. at 72:25 to 73:3.)  Plaintiff could not pinpoint what days he went without food in Cell 29, but he generally testified that "they" denied him food or threw his food on the floor.  (*Id*. at 73:4–18.)  Plaintiff later identified Cupo as the only Defendant who did not feed him on several occasions while he was residing in Cells 9, 29, 28, and 31.  (*Id*. at 73:19 to 74:16.)

### e.  The Cell Search and Extraction on December 24, 2014

Plaintiff was transferred to a new housing unit on December 21, 2014.  (FAC ¶ 63.)

On December 24, 2014, Defendant Bell allegedly told Plaintiff not to get comfortable because he would not be staying on his housing unit writing complaints against him or his co-workers.[3]  (*Id.* ¶ 64.)  Plaintiff responded that he wanted to be left alone and would not complain if he were left to himself. (*Id*. ¶ 65.)

According to the FAC, as Plaintiff was cleaning up his food tray, which Defendant Corsafulli had intentionally thrown on the ground, several officers arrived to conduct a search of his cell.  (*Id*. ¶¶ 66–68.)  In his deposition, Plaintiff testified that the officers arrived "a couple hours later" to conduct the search.  (Pl. Dep. 79:13–19.)  Plaintiff testified that he was escorted to the shower by Patterson, Bell, and Bonanno, and was held there during the search of his cell.  (*Id*. at 79:19–20.)

Plaintiff testified that the search uncovered a packet of prednisone pills that were for his asthma and a weapon that did not belong to Plaintiff.  (*Id*. at 79:13 to 80:1; 100:4–9.)  State Defendants have provided documents about this incident,[4] including a "New Jersey Department of Corrections, Unusual Incident Report," which states that "SCO Bonanno found one bic pen approx. 7 inches long with a sharpened piece of metal attached to one end and a cloth handle on the other[.]" (*See* ECF No. 138-3, at 34; *see also id*. at 37, New Jersey Department of Corrections, Preliminary Incident Report (indicating the Bonanno found the weapon during the cell search); *id.* at 50, Special Custody Report of SCO Bonanno (stating that he found the weapon "under the lip of toilet bowl").)  Plaintiff testified, however, that Patterson and another officer planted the weapon

---

[3] In his deposition, Plaintiff was asked "what did Bell do?"  Plaintiff did not testify that Bell made this comment or that he retaliated against Plaintiff for his filing of grievances.  Instead, he testified that his only claim against Bell was that he was part of the "suit up team" that extracted Plaintiff from the shower.  (*See* Pl. Dep. 90:7–14.)

[4] These documents are attached to the Declaration of Jaclyn Zimmerman ("Zimmerman Decl.").  (*See* ECF No. 138-3.)

in his cell.[5]  (Pl. Dep. 79:23 to 80:1.)  Plaintiff later testified that Bonanno, Patterson, and others

conspired to plant the shank[6] in his cell:

> Q: So you have a constitutional claim against [Bonanno] because he
> found a shank and pills in your cell?
>
> A: No, well they fabricate—I never—he fabricated a weapon in my
> cell.  He conspired with Patterson and all them with that shank in
> my cell.  That's all I know.
>
> Q:  And you used the word conspire, did you hear him make an
> agreement with Sergeant Patterson to do that?
>
> A:  I didn't hear him personally, only speculate.
>
> Q: You are speculating?
>
> A:  Yes.

(*Id*. at 89:21–25; 90:1–6.)

After the officers advised Plaintiff that he was going to lockup, Plaintiff responded, "I'm

not going to lockup, I want the camera, I want the video, I was on video.  I wanted to state my

claim on video."  (*Id*. at 80:2–5.)  According to Plaintiff, the extraction team began to prepare, and

Bundy told Plaintiff he was going to "put [Plaintiff] in the morgue" because they had found a

weapon in Plaintiff's room.  (*Id*. at 80:5–8; FAC ¶ 77.)

Plaintiff was told to "cuff up" and responded: "where the camera is at."  (Pl. Dep. 80:8–

11.)  Plaintiff testified that Patterson sprayed Plaintiff four times with mace.  (*Id*. at 80:10–11.)

---

[5] Notably, during his disciplinary proceedings, Plaintiff did not claim that the officers planted the
shank.  In his administrative appeal, Plaintiff said that the prior inmate who lived in his cell left
the shank behind.  (*See* ECF No. 138-3, at 27–28.)

[6] At Plaintiff's deposition, the parties refer to the weapon found in Plaintiff's cell on December
24, 2014, as a shank, and the Court uses this terminology as well.

Patterson also gave the orders for officers to extract Plaintiff from the shower.[7]  (*Id*. at 88:14–19.)

In his deposition, Plaintiff testified as follows:

> That's when they came in, that's when they rushed in the shower and that's when they kicked, punched and rammed my head into the floor several—after that that's when they escorted me out they took me out of the shower put my—rammed my head into the gate, going out, going up from seven, then they rammed my head into the doors going out to medical.

(*Id*. at 80:11–18.)

State Defendants contend that Plaintiff was extracted from the shower at New Jersey State Prison by a five-person extraction team consisting of Bundy, Patterson, Bonanno, Mallette and Reardon.[8]  (SSUMF ¶ 1 (citing Attachment Zimmerman Decl. pp. 31-32).)

State Defendants also provided a video of the extraction to support their version of events.[9] (ECF No. 138-5, Exhibit D.)  At the beginning of the video, Plaintiff, who is locked in the shower cell, addresses the camera, "I had pills in my cell, I don't have no shank. I just want to put that on the camera."  (*Id*.)  Thereafter, Plaintiff is ordered to turn around and Patterson states, "Mr. Smith, you've been ordered to turn around and cuff up."  (*Id*.)  At that point, Plaintiff lifts his hand and gestures at Patterson, who immediately sprays him with pepper spray.  (*Id*.)  Plaintiff turns and begins gagging and rubbing his eyes.  (*Id*.)  Plaintiff turns on the shower, which appears to have

---

[8] This appears to be an error.  The record reflects that the extraction team consisted of Defendants Mallette and Collins, and non-defendants Karmazin, Habel, and Berger.  (*See* ECF No. 138-3, Department of Corrections, Preliminary Incident Report, at 37.)

[9] Sergeant Joseph Reardon, who is not a defendant in this action, videotaped the cell extraction, the escort to the medical unit, followed by Plaintiff's escort to a cell  (SSUMF, ¶ 3; *see also* State Defs.' Ex. D; ECF No. 138-5.)  The video is shot from an adjacent cell.  A white sheet or paper and two sets of bars partially obstruct the view of the incident.  Another officer is present with Patterson, but he is not identified in the video or the reports.

external pipes and is located to the right of the doorway.  Plaintiff stands under the running water for several minutes and reaches up to hold the shower head with his right hand.  (*Id.*)  Plaintiff then yells again, "I did not have a weapon, all I had in my cell was prednisone and he sprayed me with mace."  (*Id.*)  Patterson asks if Plaintiff is "ready to cuff up and come out now.  Is that a yes or a no?"  (*Id.*)  Upon receiving no response from Plaintiff, an unidentified officer says, "that's a no—he's not answering."  (*Id.*)  Patterson sprays Plaintiff with mace again.  (*Id.*)  Plaintiff says I'm asthmatic, you can't do that."  (*Id.*)  In response, an officer says, "You gotta cuff up."  (*Id.*)  Plaintiff raises his right arm and appear to be holding onto the shower head.  (*Id.*)  Patterson returns and states "do you comply with these orders?  Back up to the cell and cuff up."  (*Id.*)  Plaintiff is coughing and gagging and does not respond.  (*Id.*)  Patterson sprays Plaintiff with mace again and orders the officers to open the shower.  (*Id.*)

At this point, the extraction team enters the shower.  (*Id.*)  Plaintiff's hand is briefly visible on the shower head as the officers in riot gear enter and take Plaintiff to the ground.  (*Id.*)  The officers pass a shield to Patterson.  (*Id.*)  The view of Plaintiff is obscured by the officers, and one of the officers yells out, "he's got a weapon" and passes a pipe to Patterson.  (*Id.*) The officers tell Plaintiff to stop resisting, and another officer advises,  "you guys can spray him again if he's not complying."  (*Id.*)  Patterson hands the spray canister to one of the officers, but it is not clear if the officers spray Plaintiff again.  (*Id.*)  At one point, Plaintiff says,  "I can't breathe" and "I'm asthmatic."  (*Id.*)  Officers are instructed to "stand him up, stand him up, and get him outta there." (*Id.*)  Plaintiff is then escorted out of the shower, cuffed in the back.  (*Id.*)  Officers then escort Plaintiff to the medical unit.  (*Id.*)

Relying on the video audio, State Defendants emphasize that Patterson asked Plaintiff three times to surrender his hands so he could be handcuffed.  (SSUMF ¶ 2 (citing Ex. D).)  According

to State Defendants, on each occasion, Plaintiff refused to comply and was pepper sprayed. (*Id.*) Notably, State Defendants also contend that Plaintiff's hand was on the shower pipe as it was removed from the shower wall.  (*Id*. ¶ 5 (citing Zimmerman Decl.).)  They further allege that the same pipe was recovered from Plaintiff after the extraction team entered the shower, forced Plaintiff to the floor, and secured his hands and legs.  (*Id*. ¶ 6, (citing Ex. D; L).)

Plaintiff, however, in his sworn testimony, denies that he ripped the pipe off the wall and swung it at the officers:

> Q. Did you try to rip a pipe off the wall when you
> were in the shower and swing it at the officers?
> A. No.
> Q. You didn't do that?
> A. No.
> Q. That is a total lie?
> A. Yes.

(Pl. Dep. 81:21–22.)  Plaintiff also testified that he was not captured on camera swinging a pipe, explaining, "[t]hey don't get me doing anything with a pipe."  (*Id*. at 82:1–6.)  In a document titled "Restitution Hearing," Plaintiff claimed that "the officers knocked [the pipe] over when 18 of them rushed into the shower cell." (ECF No. 138-3, at 63.)

As a result of the search and shower extraction, Plaintiff received several institutional disciplinary charges including assaulting any person with a weapon, possession or introduction of a weapon,[10] possession or introduction of any prohibited substances, refusing to submit to testing for prohibited substances, and destroying, altering or damaging government property.  (SSUMF

---

[10] Defendant Mallette charged Plaintiff with "assaulting any person with a weapon" (SSUMF ¶ 10) for striking Mallette's helmet and/or shield with the pipe. (*See* ECF No. 138-3, Attachment to Zimmerman Decl., at 10-12, 16.)  The charge for possession or introduction of a weapon is for the shank and not the pipe.  (*See id.* at 28, 34.)

¶¶ 7–8 (citing Zimmerman Decl. and attachments).) Plaintiff was found guilty of all the charges and appealed to the warden who upheld the charges. (*Id*. ¶ 9; Pl. Dep. 81:12–15.)

The parties do not dispute that Plaintiff was escorted to the prison infirmary after being extracted from the shower. (FAC, ¶ 81; State Defs.' Br., 23; SSUMF ¶ 12 (citing Ex. D).) State Defendants contend that an abrasion on Plaintiff's left arm was the only injury noted. (SSUMF ¶ 14.)

### f. Plaintiff Contends that Nurse Joseph Rakoczy Left him Unattended with Breathing Difficulties

When he arrived in the medical clinic at approximately 5:30 p.m., Plaintiff was evaluated and treated by Nurse Berg. (Pl. Dep. 20:10 to 21:22.) Medical Defendants emphasize that Plaintiff received treatment from Nurse Berg to bring his asthma under control. (*Id*. at 19:10–11, 21:10; ECF No. 142-3, Medical Defs.' Statement of Undisputed Material Facts ("MSUMF").) Plaintiff received a nebulizer treatment of Albuterol, which helped relieve Plaintiff's symptoms. (MSUMF ¶ 8–9 (citing Pl. Dep. 21:19–22, 21:23 to 22:2).) Relying on Plaintiff's medical records, Medical Defendants contend that "Plaintiff's condition began to improve, with his [oxygen] saturation climbing to 92%." (MSUMF ¶ 10 (citing MRF Dec. ¶ 3, Ex. A, D002665–D002672).) Thereafter, Plaintiff was admitted to the infirmary. (Pl. Dep. 19:12–13; MSUMF ¶ 11.)

In his deposition, Plaintiff testified that he developed breathing problems again within the hour of receiving initial treatment from Nurse Berg. (Pl. Dep. 19:13.) Plaintiff attempted to reach the nurse for "fifteen, 20 minutes" by pressing the emergency button on the wall before Rakoczy finally came to see him. (*Id*. at 23:7–17.) Plaintiff told Rakoczy, "I can't breathe, I can't breathe." (*Id*. at 19:14–18, 24:6–11.) Rakoczy left, and when he returned ten minutes later, Plaintiff told Rakoczy again he could not breathe. (*Id*. at 24:8–11.) Rakoczy told Plaintiff that Nurse Berg already gave him a treatment. (*Id*. at 24:12–13; MSUMF ¶ 16.) Plaintiff responded that he

couldn't breathe again and requested a Solumedrol shot and another respiratory treatment. (Pl. Dep. 24:14–24.) Plaintiff testified that Rakoczy said to him, "this ain't my thing" and "I don't have time for this shit, don't die on my watch." (*Id*. at 19:18–20; 24:14–16.) According to Plaintiff, Rakoczy left without treating Plaintiff and did not return. (*Id*. at 24:17–18.) Plaintiff also testified that Rakoczy did not have another medical provider with him when he saw Plaintiff in the infirmary. (*Id*. at 105:9–11.)

The parties dispute whether Rakoczy evaluated Plaintiff and checked Plaintiff's blood oxygen level. (FAC ¶ 83; MSUMF ¶¶ 13–14 (citing MRF Dec. ¶ 3, Ex. A, D002668).) Plaintiff testified that Nurse Rakoczy was "supposed to take [Plaintiff's] vital signs" after he was admitted to the infirmary, but he failed to do so.[11] (Pl. Dep. 22:19–25.) Medical Defendants rely on Rakoczy's note in the medical records, which indicates that he "performed an assessment of Plaintiff and noted that Plaintiff's [oxygen] saturation was 98%," (MSUMF ¶ 14 (citing MRF Dec. ¶ 3, Ex. A, D002668).) Plaintiff testified that Rakoczy left without treating him and did not return. (Pl. Dep. 24:17–18.)

The parties also dispute whether Rakoczy provided Plaintiff with an inhaler. Relying on Plaintiff's medical records, Medical Defendants contend that Rakoczy provided Plaintiff with a ProAir inhaler and noted that he would continue to monitor Plaintiff. (MSUMF ¶ 15 (citing MRF Dec. ¶ 3, Ex. A, D002668).) Plaintiff testified to the contrary:

> Q: And when you were in the infirmary when you were admitted on that date December 24th, 2014, were you provided with an inhaler to keep in your cell at that time?
>
> A: Yeah when?
>
> Q: December 24th?

---

[11] According to Plaintiff's FAC, Rakoczy commented on "how far below normal" Plaintiff's oxygen saturation results were. (FAC, ¶ 83.)

A:  No, I wasn't given nothing.

Q:  So you had no inhaler with you while you were in the cell?

A:  No.

(Pl. Dep. 105:12–20.)

It is undisputed that Nurse Neal West ("West"), from the third shift (i.e., the night shift), subsequently treated Plaintiff.  (*Id*. at 25:22 to 26:12; MSUMF ¶ 18 (citing MRF Dec. ¶ 3, Ex. A, D002668).)  Plaintiff testified that his condition deteriorated from the time he saw Rakoczy to the time he was treated by West.  (Pl. Dep. 26:20–22.)  Plaintiff saw West after being in the infirmary for over three hours.  (*Id*. at 26:3–7.)  The next entry by Nurse West occurred on December 25, 2014, at 1:54 a.m. and states the following: "Note: Under Respiratory should indicate breathing was Laboured [sic] NOT Normal."  (MRF Dec. ¶ 3, Ex. A, D002668.)

The parties do not dispute that Plaintiff was sent to Saint Francis Medical Center, where he was admitted for three days.  (Pl. Dep. 27:11–22; MSUMF ¶ 19 (citing MRF Dec. ¶ 3, Ex. A, D002665).)

### g. Dr. Ashan Oversees Plaintiff's Treatment after his Electrocution in January 2015

Plaintiff testified that on January 20, 2015, Defendant Grundy[12] escorted Plaintiff to the shower room in housing unit 1-Left.  (Pl. Dep. 29:20–23.)  Upon arrival, Plaintiff notified officers that the shower was broken, and the water was extremely cold.  (*Id*. at 29:19 to 30:15.)  Plaintiff testified that when he complained about the water, the officers told him it was cold water or no

---

[12] The docket sheet reflects that the summons was returned unexecuted against Defendant Grundy. (ECF No. 94.)  The summons included a notation that Grundy was out on medical leave and administrative leave.  (*Id.*)  Defendant Grundy is not a party to State Defendants' Motion for Summary Judgment.  (State Defs.' Notice of Mot. for Summ. J., at 2.)

shower. (*Id*. at 30:3–4.) As Plaintiff was hanging up his towel, he suffered an electric shock that propelled him to the floor. (*Id*. at 30:5–7.) Plaintiff began convulsing. (*Id.*)

A Code 53 was called after Plaintiff was electrocuted in the shower. (*Id*. at 29:19 to 30:18, 31:9-13; MSUMF ¶ 22 (citing MRF Dec. ¶ 3, Ex. A, D002580).) Plaintiff was transported to the prison medical clinic for evaluation. (Pl. Dep. 31:14-21; MSUMF ¶ 22 (citing MRF Dec. ¶ 3, Ex. A, D002580).) Plaintiff was evaluated by Nurse Dominique Ivery and received an EKG before being admitted to the infirmary. (Pl. Dep. 32:12–23; 29:19-30:15; MSUMF ¶ 24–26 (citing MRF Dec. ¶ 3, Ex. A, D002565–D002583).) At some point, a nurse reported seeing Plaintiff standing at his cell door talking and laughing with porters. (Pl. Dep. 59:11–12, 60:5–9; (MSUMF ¶ 27 (citing MRF Dec. ¶ 3, Ex. A, D002580).)

The parties do not dispute that Plaintiff received some medical treatment upon admission to the infirmary. (Pl. Dep. 34:9–11; MSUMF ¶ 32–34, 36, 38–39 (citing MRF Dec. ¶ 3, Ex. A, D002569, D002572–D002573, D002578).) The medical records indicate that Nurse Berg ("Berg") noted a small bump above Plaintiff's right ear with no redness or bleeding. (MSUMF ¶ 37 (citing MRF Dec. ¶ 3, Ex. A, D002573).) The medical records also indicate that Berg did not find abnormalities with Plaintiff's right hand/forearm area, or neck. (*Id.*) Plaintiff also denied chest pains or palpitations but complained of dyspnea. (*Id*. ¶ 35 (citing MRF Dec. ¶ 3, Ex. A, D002572–D002573).) Plaintiff also testified that he informed Nurse West of his injuries, including the burn marks, the back and neck pain, and injuries to his neck and eye and that Nurse West evaluated his injuries and provided him with pain medication. (Pl. Dep. 37:6–21.)

Plaintiff testified that the next day Ahsan "didn't come within five feet of [Plaintiff,]" discharged him without performing an examination, and told him to submit a sick slip if necessary.

16

(*Id.* at 37:25 to 38:7, 38:23 to 39:2.)  Plaintiff further testified that he wanted to show Ahsan his burn marks and tell him he had back pain.  (*Id*. at 39:3–11.)

According to Medical Defendants, Defendant Ahsan consulted with Nurse Ivery about Plaintiff's condition.  (MSUMF ¶ 30 (citing MRF Dec. ¶ 3, Ex. A, D002578).)  Medical Defendants do not dispute that Defendant Ahsan did not perform a physical examination of Plaintiff; they contend, however, that Ahsan reviewed Plaintiff's medical charts on January 21, 2015, and noted that Plaintiff appeared well-nourished, well-hydrated, was not suffering acute distress nor shortness of breath.  (MSUMF ¶ 40 (citing MRF Dec. ¶¶ 3, Ex. A, D002567).) Additionally, Medical Defendants cite to Plaintiff's medical records, which reflect that Plaintiff was stable with no complaints of chest pain, showed no signs of neurological injury, and was alert and oriented as to person, place, and time.  (*Id*. ¶¶ 28–29 (citing MRF Dec. ¶ 3, Ex. A, D002578, D002582).)  In the medical records, Ahsan also noted that Plaintiff showed no weakness, tingling, or numbness.  (*Id*. ¶ 42 (citing MRF Dec. ¶¶ 3, Ex. A, D002567).)  Finally, Medical Defendants contend that Ahsan reviewed the nurses' reports and made a medical decision to discharge Plaintiff from the infirmary with an optometry referral.  (*Id*. ¶ 43 (citing MRF Dec. ¶ 3, Ex. A, D002562–D002584).)  Medical Defendants further assert that Plaintiff was provided with discharge education and instructions, and that Plaintiff ambulated back to his housing unit with officers without voicing any acute distress.[13]  (*Id*. (citing MRF Dec. ¶ 3, Ex. A, D002563).)

---

[13] Plaintiff testified it was possible that Ahsan determined he was fit to be discharged based on reports that he was talking and laughing with porters.  (Pl. Dep. 59:11–15; MSUMF ¶ 47.) Plaintiff, however, denies being well enough to be discharged and "still needed medical treatment[.]"  (Pl. Dep. 59:12–16.)  Plaintiff also testified "[a]s far Dr. Ahsan . . . I think like—I think it was a misunderstanding."  (*Id*. at 59:6–8.)  Plaintiff clarified that he could not say what was on Dr. Ahsan's mind.  (*Id*. at 59:3–4; MSUMF ¶ 48.)

Three days later, Plaintiff submitted a sick call slip for neck and back pain and was treated by the triage nurse who gave him pain medication and referred him to Ivory for further treatment. (Pl. Dep. 40:22 to 42:15.)  Plaintiff also testified that he was provided with pain medication, muscle relaxers, and physical therapy in connection with this incident; he was also evaluated for an eye injury in the prison and sent to an outside eye specialist.  (*Id*. at 47:10 to 48:19.)

### h. Anderson Charges Plaintiff with Lying after He Complains about the Lack of Running Water in his Cell

In late January 2015, Plaintiff was moved back to Collin's and Cupo's tier and was placed in Cell 32.  (FAC, ¶ 102.)  Plaintiff noticed that the water was turned off in the cell.  (*Id*. ¶¶ 102–03.)  Plaintiff complained to Collins and another corrections officer who told him that a work order would be submitted.  (*Id*. ¶ 104.)  Plaintiff contacted the prison's ombudsman several times over the next three weeks to complain that his cell "had no running water" and that officers "are not feeding me."  (SSUMF ¶ 43; FAC, ¶¶ 105–06.)

The record submitted by State Defendants includes an email to NJSP administrators from the ombudsman, which is dated January 29, 2015; in that email, the ombudsman relayed Plaintiff's complaint that he is "housed in a cell for one week with no running water, sheets, or blankets" and that Plaintiff wished to speak with SID.[14]  (ECF No. 138-6, Ex. K, at 39.)  On February 2, 2025, the ombudsman emailed again, stating that that Plaintiff is claiming that "he still has no running water in his cell, no clothing, and no sheets on his mattress.  [Plaintiff also] claims the window on the unit is open and he is very cold."  (*Id.*)  On February 12, 2015, the ombudsman sent another email because Plaintiff was still "claim[ing] that [his] water [was] not working."  (*Id*., Ex. K at 38.)  The ombudsman noted that he warned Plaintiff that he "would be given a charge if he is

---

[14] Plaintiff also complained about the assault and electrocution.

18

lying" and that Plaintiff was "adamant" that the water was not working. (*Id.*) On the same date, Administrator Campos directed staff to conduct a personal check of Plaintiff's cell and noted that Plaintiff should be given a charge "ONLY if he is truly lying, which must be properly documented." (*Id.*) On February 15, 2015, Sean Davis wrote the following to Campos: "Sgt Anderson directed to personally check the inmate's cell this morning. Sgt Anderson found that the sink worked properly and the toilet flushed. Sgt Anderson charged I/M Smith with 305 Lying, providing a false statement to a staff member." (*Id.*)

With respect to this incident, Plaintiff testified that Anderson and another officer "pulled [Plaintiff] out of his cell and checked to see if [Plaintiff] had water on" in the cell. (Pl. Dep. 85:10–15.) Plaintiff further testified that the water was not on in his cell when Anderson removed him, but it was turned on when Plaintiff came back. (*Id*. at 85:15–17.) In his deposition, Plaintiff testified that Anderson "wrote him up because [Plaintiff] called the ombudsman and [the ombudsman] called the jail[.]" (*Id*. at 84:16–85:6.) Plaintiff also testified that Anderson told him "do us all a favor and die when he wrote the fake charge." (*Id*. at 86:15–18.)

According to State Defendants, Anderson knew that Plaintiff complained to the ombudsman that the water was turned off, checked Plaintiff's cell and found that the water was turned on, and properly charged Plaintiff with lying to a staff member. (SSUMF ¶¶ 43-49; *see also id.* at ¶ 11 (citing Ex. C, 117–22).)

Plaintiff further testified that in March 2015, he was found not guilty of the charge of lying to a staff member, after a social worker wrote a statement on his behalf. (Pl. Dep. 84:6–13; 85:18 to 86:12.) Plaintiff's disciplinary record includes an email dated February 18, 2015, from the social worker stating that he watched Plaintiff press the lever on his sink and observed that "very little water came out[.]" (ECF No. 138-6, Ex. K at 41.) State Defendants have provided a document

titled "Discipline and Appeals Results," which indicates that Plaintiff was found guilty of the disciplinary charge on February 15, 2015, and received a verbal reprimand and a referral to the psychiatric department.  (*See* SSUMF ¶ 11 (citing ECF No. 138-5, Ex. C at 95); *see also* ECF No. 138-6, Ex. K at 33.)

### i.  Plaintiff files an Untimely Tort Claims Notice

State Defendants contend that Plaintiff failed to file a Tort Claim Notice with respect to his negligence claims.  (SSUMF ¶ 58.)  The record reflects that Plaintiff's Tort Claim Notice was received on March 1, 2016, and the State of New Jersey, Department of the Treasury, Division of Risk Management rejected it as filed outside the 90-day window for filing a Notice of Claim.  (*See* ECF No. 138-5, Ex. E at 102.)  The letter also provided Plaintiff with instructions for filing a late claim.  (*See id.*)  In a certification attached to his Tort Claim Notice, Plaintiff contends that he submitted the Tort Claim Notice on February 28, 2016, at the earliest.  (State Defs.' Ex. E at 104–05.)

### j.  Procedural History

On October 24, 2016, Plaintiff filed his initial Complaint.  ("Complaint" ECF No. 1.)  The District Court screened the original complaint for dismissal under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A and dismissed Plaintiff's § 1983 claims against State Defendants in their official capacities for damages and his state law claim for intentional infliction of emotional distress and permitted the remaining claims to proceed.  (ECF No. 6.)

On February 19, 2019, Plaintiff filed an amended complaint.  (ECF No. 35.)  On July 8, 2022, both sets of Defendants moved for summary judgment.  (ECF Nos. 138, 142.)  The Court subsequently terminated the Motions for Summary Judgment because the record was incomplete

and later terminated the matter because Plaintiff failed to update his address in compliance with L. Civ. R. 10.1.[15]

Plaintiff updated his address on May 30, 2024, and the Court reopened the matter and reinstated the Summary Judgment Motions on July 19, 2024.  (ECF Nos. 153-154.)  Plaintiff did not file an opposition brief, but, on October 29, 2024, he filed a Motion for *Pro Bono* Counsel. (ECF No. 161.)  On November 4, 2024, the Court denied Plaintiff's motion and ordered him to submit a brief in opposition to Defendants' Motions for Summary Judgment within 30 days.  (ECF No. 162.)

On December 19, 2024, Medical Defendants submitted a letter asking the Court to decide their motion as unopposed because Plaintiff failed to submit an opposition brief by the December 4, 2024, deadline.  (ECF No. 163.)  The following day, the Court granted Medical Defendants' request to treat the motion as unopposed.  (ECF No. 164.)

On February 27, 2025, the Court issued a Text Order directing State Defendants to submit a complete Statement of Undisputed Material Facts within 14 days and provided Plaintiff with an additional 14 days to respond.  (ECF No. 165.)  The Court subsequently granted State Defendants a short extension of time to file their Statement of Undisputed Material Facts and extended Plaintiff's time to respond, and State Defendants filed their complete Statement of Undisputed Material Facts on March 31, 2025.  (ECF Nos. 166-168.)  Plaintiff did not respond to the Court's

---

[15] On October 3, 2022, the Magistrate Judge terminated the Summary Judgment Motions because Plaintiff had not viewed the video of the December 24, 2014 cell extraction.  (ECF No. 145.)  The Magistrate Judge reactivated the Summary Judgment Motions on November 9, 2022, and directed Plaintiff to file his opposition by November 21, 2022.  Defendants' reply briefs were due by November 28, 2022.  (ECF No. 148.)  On June 5, 2023, the Court terminated the Summary Judgment Motions and directed State Defendants to provide the Court with a copy of the video of the December 24, 2014 cell extraction by June 20, 2023.  (ECF No. 150.)  On March 20, 2023, the Court terminated the matter because Plaintiff failed to update his address in compliance with L. Civ. R. 10.1.  (ECF No. 152.)

Order.  The Court relisted the Motions for Summary Judgment on May 16, 2025.  (ECF No. 169.)

Because Plaintiff did not submit any opposition to the Motions for Summary Judgment, despite

being given numerous opportunities, the Court will treat them as unopposed, as explained below.

## II.    STANDARD OF REVIEW FOR AN UNOPPOSED SUMMARY JUDGMENT MOTION

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States*

*v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749

F.3d 217, 222 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322–23 (1986) (explaining that summary judgment is appropriate where "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits if any

. . . demonstrate the absence of a genuine issue of material fact" and that the moving party is

entitled to a judgment as a matter of law).

It is well established that the moving party "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex,* 477 U.S. at 323 (citation omitted).  The moving party may also meet its burden by

"showing—that is, pointing out to the district court—that there is an absence of evidence to support

the nonmoving party's case when the nonmoving party bears the ultimate burden of proof."

*Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (internal quotation marks

omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the

non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate.  *See id.* at 250–51.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor."  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  "The judge's function at the summary judgment stage is solely to determine whether there is a genuine issue of material fact for trial."  *Watson v. Rozum*, 834 F.3d 417, 421–22 (3d Cir. 2016) (citing *Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002)).

Where, as here, a motion for summary judgment is unopposed, and Plaintiff has not filed a responsive brief, Local Rules 7.6 and 56.1 give this Court the power to deem the summary judgment motion unopposed.  *See Taylor v. Harrisburg Area Community College*, 579 F. App'x 90, 93 (3d Cir. 2014) (noting that the District Court granted summary judgment after conducting "a thorough review of the record").  Nevertheless, Federal Rule of Civil Procedure 56(e)(3) "still requires the Court to satisfy itself that summary judgment is proper because there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law."  *Ruth v. Selective Ins. Co. of Am.*, No. 15-2616, 2017 WL 592146, at *2 (D.N.J. Feb. 14, 2017); *see also Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) (failure to

respond to a summary judgment motion "is not alone a sufficient basis for the entry of a summary judgment"). Failure to oppose the motion does mean, however, that the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage*, 922 F.2d at 175.

Moreover, because Plaintiff's FAC is sworn and verified, the Court considers it as an affidavit to the extent it is based upon personal knowledge, provides facts that would be admissible in evidence, and is supported by Plaintiff's deposition testimony. *See Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n. 1 (3d Cir. 2017); *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as affidavit for summary judgment purposes). *But see Coit v. Garman*, 812 F. App'x 83, 87 (3d Cir. 2020) (treating sworn allegations in verified complaint as a "sham affidavit" for purposes of summary judgment and refusing to credit them in light of plaintiff's "glaring omission" of those allegations in his deposition testimony and opposition brief).

## III. **DISCUSSION**

State Defendants contend that they are entitled to judgment on Plaintiff's federal claims brought pursuant to 42 U.S.C. § 1983 because the undisputed evidence establishes that Plaintiff's excessive force, failure to intervene, conditions of confinement, and retaliation claims lack merit and do not rise to the level of a constitutional violation.[16] (ECF No. 138-1, State Defs.' Br., at 14–43.) State Defendants also contend that they are entitled to qualified immunity because they did not violate Plaintiff's constitutional rights. (*Id.* at 48–52.) Finally, State Defendants contend that they are entitled to summary judgment on the state law claims because Plaintiff did not file a timely tort claim notice. (*Id.* at 44–46.)

---

[16] State Defendants also argue that the incidents of verbal harassment do not rise to the level of a constitutional violation, but Plaintiff's FAC did not assert constitutional claims based on verbal harassment, and the Court does not construe the Complaint as raising that type of claim.

Medical Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's § 1983 claims that Nurse Rakoczy and Dr. Ahsan were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (ECF No. 142-2, Medical Defs.' Br., at 1–12.)

The Court considers each set of Defendants separately.

### a.  State Defendants' Motion for Summary Judgment

The Court begins with State Defendants' arguments for summary judgment on the federal claims.  Plaintiff's constitutional claims are governed by 42 U.S.C. § 1983.  A plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of his rights by a person acting under the color of state law. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 464 (3d Cir. 1989); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).  State Defendants are state actors, and Plaintiff brings claims under the Eighth Amendment for excessive force, failure to intervene, conditions of confinement, as well as claims for First Amendment retaliation.

### 1.  Excessive Force and Failure to Intervene Claims

Plaintiff contends that Patterson, Mallette, Bell, and Collins used excessive force and violated his Eighth Amendment rights while extracting him from the shower on December 24, 2014.  Alternately, Plaintiff contends that these Defendants were present and are liable for failure to intervene in their coworkers' use of excessive force.

Plaintiff's excessive force claims arise under the Eighth Amendment because he is a convicted prisoner. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  The Eighth Amendment protects convicted prisoners from any force applied "maliciously and sadistically for the very purpose of

causing harm." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).  To be liable under the Eighth Amendment, the defendant must act with a "sufficiently culpable state of mind," and the conduct must be objectively harmful enough to violate the Constitution.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The subjective inquiry is "whether [the] force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson*, 503 U.S. at 9–10. The objective inquiry is whether the inmate's injury was more than *de minimis.  Id.* at 9–10.  The Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim."  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *see also Travillion v. Wetzel*, 765 F. App'x 785, 795 n. 18 (3d Cir. 2019) (citing *Brooks v. Kyler*, 204 F. 3d 102, 107–09 (3d Cir. 2000)).

In analyzing an Eighth Amendment excessive force claim, courts consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response. *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (quoting *Brooks*, 204 F.3d at 106).

State Defendants argue that they are entitled to summary judgment on Plaintiff's Eighth Amendment excessive force claims because the video evidence contradicts Plaintiff's version of events and that use of force, as shown on the video, was subjectively and objectively reasonable. (State Defs.' Br., at 22–29.)  State Defendants further argue that Plaintiff's version of events contradicts the findings of the hearing officer, and the Court should decline to consider them.  (*Id.* at 29–31.)

Although Plaintiff did not submit an opposition brief, he is proceeding *pro se*, and his verified complaint, deposition testimony, and the video of the cell extraction are part of the summary judgment record that the Court must consider in deciding whether State Defendants are entitled to summary judgment as a matter of law. *See Koyi v. Cnty. of Monmouth,* No. 19-15605, 2024 WL 1928474, at *6 (D.N.J. Apr. 30, 2024) (denying unopposed summary judgment where video and deposition testimony showed the defendants were not entitled to judgment as a matter of law); *Salaam v. Merlin*, No. 08-1248 2010 WL 2545951, *6 (D.N.J. Jun. 18, 2010) (denying unopposed summary judgment motion as to plaintiff's excessive force claim on the basis of testimony provided in his deposition).

Here, Plaintiff contends he was pepper-sprayed by Patterson and beaten by the extraction team without justification. Defendants argue that they used force only to restore discipline after Plaintiff "refused to be handcuffed, ripped a pipe off the shower wall and attempted to use it as a weapon." (State Defs.' Br., at 26.) Defendants urge the Court to adopt their version of events because Plaintiff's version contradicts the video evidence. (*Id.*, at 22.) In *Jacobs*, the Third Circuit succinctly summarized the standard in cases involving security footage:

> At summary judgment, a district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) . . . . But the existence of a security video presents an "added wrinkle." *Id*. at 378. In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is "blatantly contradicted" by the video footage. *Id.* at 380.

*Jacobs*, 8 F.4th at 192 (cleaned up); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where there are video recordings of the incident in question, courts need not adopt the non-movant's version of the facts if the recording blatantly contradicts the non-movant's version so that no reasonable jury could believe it."). Defendants argue that Plaintiff's account is "utterly

discredited" by the video evidence.  (State Def's Br., at 23.)  As explained below, the Court disagrees.

The Court begins with Patterson's repeated use of pepper spray on Plaintiff.  Whether Patterson's use of pepper spray constitutes excessive force depends on the circumstances.  If "mace, tear gas, or other chemical agent[s]" are reasonably necessary "to prevent riots or escape or to subdue recalcitrant prisoners," the use of such agents would not constitute excessive force or cruel and unusual punishment.  *Echols v. Anderson*, No. 23-650, 2023 WL 4487767, at *3 (D.N.J. July 12, 2023) (citing *Leaphart v. Campbell*, No. 21-1293, 2023 WL 4276463, at *12 (M.D. Pa. June 29, 2023) (collecting authorities)).  On the other hand, "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain."  *Id.* (cleaned up); *see also Robinson v. Danberg*, 673 F. App'x 205, 211–12 (3d Cir. 2016) (explaining that inmate's claim that he was "maced" while he posed "no imminent threat" and for no "legitimate penological reason" could result in factfinder determining that force was more than *de minimis* and unconstitutional); *but see Carter v. Wetzel*, No. 22-1643, 2025 WL 985389, at *5 (3d Cir. Apr. 2, 2025) (assuming arguendo that subjecting a noncompliant chemically-sensitive inmate to a single burst of pepper spray violated the Eighth Amendment, but finding that right was not clearly established in 2016); *Rivera v. Redfern*, 98 F.4th 419, 421–25 (3d Cir. 2024) (explaining in the context of deliberate indifference that failing to remove an asthmatic bystander prisoner from his cell before deploying pepper spray near him, even when it had an opportunity to do so, was not a clearly established Eighth Amendment violation).

With respect to the first factor, the need for force, Defendants argue Patterson pepper sprayed Plaintiff because he repeatedly refused a verbal order to cuff up, raised his hand toward

the officers, pulled the pipe off the wall, and used it as a weapon.  (State Defs' Br., at 26.)  They further contend that Plaintiff's failure to follow orders necessitated some use of force to gain Plaintiff's compliance.  (*Id.*)  A reasonable jury could find, however, that Patterson could see that Plaintiff was struggling to breathe after he deployed the pepper spray for the first time and could not comply with the subsequent orders to cuff up.  Defendants also argue that the second factor—the need for the amount of force used—also weighs in their favor.  A reasonable jury could find, however, that Plaintiff was behind bars and that Patterson's initial use of mace was enough to diffuse any threat to the officers and that macing him repeatedly while he was struggling to breathe was a disproportionate use of force.

With respect to the third factor—the extent of the injury—Defendants note that Plaintiff received only bumps and bruises, but they ignore the record evidence of Plaintiff's ongoing respiratory distress, which required him to be transported to the emergency room.  A reasonable jury could also determine that the fourth factor—the extent of the threat faced by the officers—weighs in Plaintiff's favor because he was confined in the shower when he failed to respond to the officer's requests to cuff up and did not present an immediate threat to Patterson or the other officers' safety.  Finally, a reasonable jury could find that the fifth factor—the extent of the efforts to temper the use of force—weighs in Plaintiff's favor in light of the number of times Patterson pepper sprayed Plaintiff.  Notably, the Third Circuit's recent non-precedential decision in *Carter* involved  "a single three-second burst of pepper spray" on an asthmatic inmate, 2025 WL 985389 at *1, and not the repeated use of pepper spray at issue here.

For all these reasons, the question of whether Patterson pepper sprayed Plaintiff in a good faith effort to maintain and restore discipline or maliciously for the purpose of causing harm is a

jury question that the Court cannot resolve at summary judgment.[17]  *See Washington v. Amand*, 308 F. Supp.3d 497, 505 (D. Mass. 2018) ("it is a jury question as to whether Doher knowingly authorized the use of force on an asthmatic and whether it was excessive in the circumstances").

To justify the extraction team's use of force, State Defendants argue that the video footage clearly shows Plaintiff pulling the shower pipe off the wall and using it as a weapon.  At best, however, the video shows a glimpse of Plaintiff's hand on the shower head just before the extraction team enters the shower cell.  When the extraction team enters the shower cell, they obscure the view of what happens next.  Although a reasonable jury could find that Plaintiff pulled the shower pipe off the wall intentionally, the Court must view the evidence in the light most favorable to Plaintiff.  Here, a reasonable jury could find that that Plaintiff was holding onto the shower head, as he did each time he was pepper sprayed, and that he failed to let go of the shower head when the corrections officers stormed into the shower cell, causing the shower pipe to dislodge from the wall inadvertently.  Although the corrections officers call out that Plaintiff has a weapon and pass the pipe out of the cell, Plaintiff is not visible beneath the pile of officers, and the video does not show Plaintiff using the pipe as a weapon.  Given all the circumstances, a reasonable jury could find that there is an innocent explanation rather than an intention to use the pipe as a weapon against the officers.

Because the video does not blatantly contradict Plaintiff's version of events with respect to this issue, the Court adopts Plaintiff's account for purpose of summary judgment.  And viewing the facts in the light most favorable to Plaintiff, including his testimony that he did not pull the pipe

---

[17] Plaintiff also claims that Patterson told Plaintiff prior to the cell extraction that Patterson was going to get the extraction team to beat Plaintiff up and Bundy told Plaintiff he was going to put Plaintiff "in the morgue."  If a jury found Plaintiff's claims credible, it could find that Patterson and/or Bundy acted maliciously or for the purpose of causing harm during the cell extraction.

off the wall and wield it as a weapon, the issue of whether the extraction team used excessive force is a jury question. If a jury finds Plaintiff credible, it could reasonably determine that some force may have been necessary, but the extraction team members' use of force was disproportionate to the threat presented by Plaintiff, and that they did not temper the severity of their response when they kicked and punched Plaintiff even though he was not resisting, did not have a weapon, and had been pepper-sprayed several times and was struggling to breathe.

Defendants next argue that Plaintiff's version of events is inconsistent with the disciplinary officer's findings. (*See* State Defs.' Br., at 21–23.) "The mere fact of a conviction for assault or similar conduct does not automatically preclude recovery on an excessive force claim brought under § 1983, arising out of the same incident." *Ramos-Ramirez v. Berwick Borough*, 819 F. App'x 103, 106 (3d Cir. 2020). State Defendants do not explicitly argue that Plaintiff's claims are categorically barred by the favorable termination rule of *Heck v. Humphrey*, 512 U.S. 477, 485–87 (1994). Under that doctrine, a federal civil rights action "will not lie when a state prisoner challenges the fact or duration of his confinement;" nor may such a prisoner use a civil rights claim to seek either his "immediate release" or a "shortening" of his term of confinement. *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005). They argue instead that Plaintiff cannot offer any evidence at summary judgment or trial that contradicts "the findings" of the disciplinary hearing officer.

For this proposition, Defendants rely on a non-binding district court decision, *Concepcion v. Morton*, 125 F. Supp.2d 111, 123 (D.N.J. 2000), *rev'd on other grounds* 306 F.3d 1347 (3d Cir. 2002). There, the district court held that two prisoners' suit for excessive force could proceed so long as the court did "not consider evidence that implies that the disciplinary punishments imposed against the plaintiffs are invalid," and that therefore, "any facts used as a basis for plaintiffs'

31

excessive force claims cannot contradict the disciplinary proceedings arising from this same incident." *Id.*

State Defendants do not address more recent decisions in this circuit holding that the *Heck* doctrine does not bar a plaintiff from presenting facts or evidence in his § 1983 action that contradict disciplinary findings so long as success on that action would not necessarily imply the invalidity of the disciplinary proceedings. As explained by another court in this District, "the Supreme Court has never held that parties are collaterally estopped from contesting facts from prison disciplinary findings." *Ruiz v. New Jersey Department of Corrections*, No. 15-3304, 2020 WL 1130210, at *4 (D.N.J. Mar. 9, 2020) (citing *Simpson v. Thomas*, 528 F.3d 685, 694 (9th Cir. 2008)) ("Since the inception of the rule in *Heck*, the Court has only addressed this issue a few times, and in none of those cases did the Court address the use of *Heck* to bar evidence."); *see also Moore v. Colon*, No. 19-15379, 2023 WL 2675072, at *9 (D.N.J. Mar. 29, 2023) ("the Court is unconvinced that *Heck* operates as a doctrine that bars evidence in an § 1983 action even where it does not bar the § 1983 claims"); *Altagracia v. Viola*, No. 21-13017, 2022 WL 17417112, at *4 (D.N.J. Dec. 5, 2022) ("*Heck*, then, does not provide the basis for issue preclusion that Defendants assert, and the request for issue preclusion based on *Heck* is denied at this time."). In light of more recent persuasive authority and State Defendants' failure to address it, this Court likewise declines to extend *Heck* to bar Plaintiff's evidence at summary judgment.[18]

State Defendants also argue that they are entitled to qualified immunity on the excessive force claims because evidence indicates they acted reasonably under the circumstances and did not

---

[18] State Defendants rely on *Concepcion* and do not argue that the state court disciplinary proceedings themselves have preclusive effect on this litigation. The Court, therefore, does not reach that issue. *See Altagracia*, 2022 WL 17417112, at *4 n.2 (declining to apply *Heck* to bar evidence but noting the potential preclusive effect of the prison disciplinary proceedings).

violate a clearly established constitutional right.  (Defs.' Br., at 48.)  "'[T]he judicially created doctrine of qualified immunity' shields governmental officials from suit and from liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mack v. Yost*, 63 F.4th 211, 221 (3d Cir. 2023) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 164–65 (3d Cir. 2021)); *see also Ashcroft v. al–Kidd,* 563 U.S. 731, 735 (2011).  The first prong of qualified immunity asks, "whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right," and the second prong asks, "whether that right was clearly established." *Mack*, 63 F.4th at 227 (citing *Peroza-Benitez*, 994 F.3d at 165). "[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment. *Id.* (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)).

State Defendants argue that the record clearly contradicts Plaintiff's claims of excessive force and show that Defendants' use of force was objectively reasonable and was used to restore discipline and order to the correctional facility.  (State Defs.' Br., at 58.)  The Court, however, has already found that State Defendants are not entitled to summary judgment on the excessive force claims.  As such, they are not entitled to qualified immunity under prong one.

"Because the [State] Defendants have failed on the first prong of the qualified immunity analysis, they are only entitled to summary judgment if they can bear the burden of showing, on the second prong, that reasonable officers could not have known that their actions violated clearly established law." *Mack*, 63 F.4th at 228 (citing *Halsey*, 750 F.3d at 288). To determine whether a right was "clearly established," courts conduct a two-part inquiry that defines the right at the appropriate level of specificity and asks whether that right was clearly established such that a

33

reasonable official would understand that what he is doing violates that right.[19]  *See Peroza-Benitez*, 994 F.3d at 165 (citations omitted).  Here, however, State Defendants make no arguments pertaining to the second prong and merely repeat the arguments advanced in support of summary judgment.  Because State Defendants have not met their burden of persuasion, they are not entitled to qualified immunity on prong two of the qualified immunity analysis.

For these reasons, the Court denies summary judgment to Patterson, Mallette, Collins, and Bell on the Eighth Amendment excessive force claims and also denies without prejudice their requests for qualified immunity.[20]

State Defendants also seek summary judgment on Plaintiff's Eighth Amendment claims for failure to intervene.  Under Third Circuit law, "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Smith*, 293 F.3d at 650.  Moreover, "a corrections officer [cannot] escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers."  *Id.*

Plaintiff accuses Defendants Bundy, Patterson, Mallette, Bonanno, and Bell of "failing to intervene while [their] coworkers used unnecessary and excessive force." (FAC ¶¶ 117–21.)  The

---

[19] Courts "answer this question by first looking to factually analogous Supreme Court precedent, as well as binding opinions from [the Third Circuit].  *Peroza-Benitez*, 994 F.3d at 165 (citing *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017). Next, courts consider whether there is a "robust consensus of cases of persuasive authority in the Courts of Appeals" and may also consider district court cases from within the Third Circuit or elsewhere. *Id.* at 165–66 (citations omitted).

[20] Nothing prevents Defendants from raising qualified immunity at trial.  The Court also notes that the record indicates that Bell was not a member of the extraction team, and it is unclear whether he was present for Patterson's use of pepper spray or the extraction. Although the Court declines to *sua sponte* dismiss the excessive force claims against Bell, State Defendants may seek dismissal of the excessive force claims against Bell prior to trial if he was not a member of the extraction team.

Court views this claim liberally to assert that these officers, to the extent they did not participate in pepper spraying or beating Plaintiff, failed to stop it. State Defendants do not argue that any of the officers were not present when Plaintiff was maced and extracted from the shower. Instead, State Defendants move for summary judgment on the sole basis that Plaintiff cannot establish the elements of a failure to intervene claim because his underlying excessive force claims fail. (State Defs.' Br., at 32.) Here, the Court has determined that State Defendants are not entitled to summary judgment on the excessive force claims. Therefore, the Court also denies summary judgment on the failure to intervene claim.[21]

## 2. Conditions of Confinement Claims

Plaintiff also brings Eighth Amendment conditions of confinement claims against Collins, Cupo, and D'Ilio related to the conditions in his cell. Plaintiff testified that he was placed in a cell with standing water, mold, mildew, dust, and mice droppings, and also testified that he was deprived of food on occasion and was placed in cells that did not have running water. State Defendants argue that they are entitled to summary judgment on these claims because the conditions were not sufficiently serious, and Plaintiff was not deprived of the minimal civilized measure of life's necessities. (State Defs.' Br., at 35.)

The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 (1993)). Under the Eighth Amendment, States must not deprive prisoners of their "basic human

---

[21] State Defendants also argue for summary judgment on the failure to protect claims arising from Plaintiff's claim that he was electrocuted in the shower on January 20, 2015. (State Defs.' Br., at 32.) Because the State does not represent Grundy, who is unserved, the Court does not address this argument. Instead, the Court notifies Plaintiff that it intends to dismiss the complaint as to Grundy under Fed. R. Civ. P. 4m for lack of service.

needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling*, 509 U.S. at 32 (citation omitted) (internal quotation marks omitted).  Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Thus, a claim about prison conditions may rise to the level of an Eighth Amendment violation where the prison official "deprived the prisoner of the minimal civilized measure of life's necessities" and "acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health." *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (citing *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016)); *see also Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015)).  "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Federal Bureau of Prisons*, 934 F.3d 368, 373–74 (3d Cir. 2019) (cleaned up); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (conditions of confinement, "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities" in violation of the Eighth Amendment).

State Defendants D'Ilio, Collins, and Cupo argue that they are entitled to summary judgment on the claims related to the conditions in Plaintiff's prison cells because the conditions about which he complains are not sufficiently serious and Plaintiff fails to establish that these Defendants acted with deliberate indifference.  (State Defs.' Br., at 35–36.)

A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834.  "[T]he presence of mold can raise a cognizable [Eighth Amendment] claim if it poses a substantial risk of serious harm." *Helling*, 509 U.S. at 35 (holding that inmates should not be "expose[d] to

[contaminants] that pose an unreasonable risk of damage to future health).  Courts within this District have rejected conditions of confinement claims based on infestations with mice, mold, or other poor housing conditions where the prisoner has not "produced evidence that any of the conditions in his cell jeopardized, or potentially jeopardized, his health, or caused the cell to be unfit for habitation."  *Mitchell v. Dodrill*, 696 F.Supp.2d 454, 467 (M.D. Pa. 2010); *see also Swiderski v. Harmon*, No. 19-2321, 2020 WL 6286720, at *9 (E.D. Pa. Oct. 27, 2020) (granting summary judgment where prisoner "did not offer evidence there is a 'substantial risk of serious harm from mold exposure.").

Plaintiff contends that Collins and Cupo exposed Plaintiff to a substantial risk of future harm by placing Plaintiff in a "condemned" cell that had standing water, mold, mildew, and mice droppings, despite knowing that Plaintiff suffered from chronic asthma.  As relevant here, Courts consider the plaintiff's specific vulnerabilities that are known to prison officials in assessing whether conditions of confinement violate the Eighth Amendment.  *See Palakovic*, 854 F.3d at 225 (considering whether prisoner's placement in solitary confinement was inhumane in light of his mental illness).  Plaintiff testified that he complained to Collins and Cupo about the conditions of his prison cells, and on at least one occasion Plaintiff requested permission to speak to a supervisor due to concerns about exposure to mold and mildew, but the Defendants refused his request.

Even were the Court to assume that Collins and Cupo knew about Plaintiff's cell conditions and also knew that Plaintiff had chronic asthma, Plaintiff has not provided any evidence to support his claims that any of his cells were "condemned" or that the cell conditions exacerbated his asthma or caused allergy attacks.  The only evidence Plaintiff provides on this issue is his testimony that a doctor told him that his cell conditions could have triggered his allergies and asthma.  In

*Swiderski v. Harmon*, 2020 WL 6286720, at *11, the district court rejected the plaintiff's assertions that his exposure to mold in his cell caused his allergies and chronic rhinitis. *Id.* ("Absent expert testimony, or any evidence, we cannot infer conditions in Mr. Swiderski's cell and the showers caused his symptoms or harm.")  Other courts around the country have taken the same view. *See Rayford v. Sherman*, 2022 WL 1793162, at *19 (E.D. Cal. May 26, 2022) ("Plaintiff's opinion that he developed respiratory problems because he was housed in a cell with water leaks is evidence of what he believes, not of what caused the symptoms.  Only an expert witness with specialized knowledge may determine whether the conditions in Plaintiff's cell was the cause of Plaintiff's symptoms or medical condition."); *Ferebee v. Manis*, No. 19-628, 2021 WL 631397, at *7 (W.D. Va. Feb. 18, 2021) (granting summary judgment to defendants where plaintiff "claims that he suffered injury to his health from exposure to mold" in his housing unit but he "produced no medical evidence of any physical injury, or even any risk of injury, caused by exposure to mold or mildew"); *Watkins v. Maryland Div. of Corrections*, No. 09-294, 2010 WL 234975, at *5 (D. Md. Jan. 15, 2010) (rejecting the plaintiff's "bald allegations that his asthma and the papilloma on his nose were caused by any mold in his cell" as "simply unsupported by the medical records").

Here, Plaintiff's medical records support Plaintiff's claim that he has chronic asthma, but they do not support his claims that he is allergic to animals, mold or mildew, or that any prison medical providers told him that his cell conditions caused his asthma or allergy attacks.  Absent any evidence that his asthma attacks or allergies were caused by the standing water, mold, mildew, dust or mouse droppings in his cell, Plaintiff testimony does not show that his cell conditions exposed him to a substantial risk of serious harm.

Moreover, in order to be deliberately indifferent, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

also draw that inference." *Farmer*, 511 U.S. at 837.  Here, there is no evidence that Collins and Cupo actually drew the inference that Plaintiff's cell conditions exposed Plaintiff to a serious risk to his future health.  The fact that they knew Plaintiff had asthma and refused Plaintiff's request to speak to a supervisor about the conditions of cell, without more, does not show that they acted with deliberate indifference.  Plaintiff also testified that he suffered two asthma attacks in November 2014, and that he was moved to the back of the unit after the second asthma attack.  But this evidence suggests that prison officials responded reasonably to a potential risk of harm by changing his cell and does not support the inference that Collins or Cupo knew that Plaintiff's cell conditions posed a serious danger to his future health and refused to act.

State Defendants also seek summary judgment on Plaintiff's claim that he was denied "running water" in his cell.  There is a crucial distinction between the denial of drinking water and running water.  The complete denial of drinking water rises to the level of an Eighth Amendment violation.  *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 220, 228–29 (3d Cir. 2015) (holding that a complete lack of potable water for three days "other than the water in a toilet bowl . . . poses a clear substantial risk of serious harm to an inmate"); *see also Gibson v. Crouch*, No. 20-2021, 2022 WL 7352267, at *2–3 (3d Cir. Oct. 13, 2022) (per curiam) (Depriving an inmate of drinking water for days is objectively serious); *Wolfe v. Christie*, No. 10-2083, 2013 WL 3223625, at *5 (D.N.J. June 25, 2013) ("[T]here is no doubt that potable water constitutes a basic human need.").

The denial of running water, on the other hand, does not generally rise to the level of an Eighth Amendment violation where a prisoner has access to drinking water.  *Collier v. Adams*, 602 F. App'x 850, 853 (3d Cir. 2015) (per curiam) (holding that the deprivation of running water in cell for 77 hours was not sufficiently serious where plaintiff was not denied drinking water and

other liquids); *Alpheaus v. Camden Cnty. Corr. Facility*, No. 17-0180, 2017 WL 2363001, at *14 (D.N.J. May 31, 2017) (concluding that plaintiff failed to state a claim based on his non-specific allegation of "no running water"); *see also Gardner v. Lanigan*, No. 137064, 2018 WL 4144689, at *4 (D.N.J. Aug. 30, 2018) ("While denial of access to drinking water can be an Eighth Amendment violation, here, it is not clear whether Plaintiff had access to alternative sources of water, nor how long water was denied to him." (citation omitted)).

Plaintiff does not allege or testify that he was denied drinking water. He alleges in his FAC that he was unable to wash his hands for 10 days, but he did not testify about any ill effects from the denial of running water. *See Coit v. Garman*, 812 F. App'x at 88 (affirming summary judgment on prisoner's unelaborated claims that he had "very little food" and lacked "running water" where the record showed that he "had access to drinking water (just not running water)" and failed to testify "as to any issues that arose from his bare bones claim of not having running water.").

For these reasons, the Court grants summary judgment to Defendants Collins and Cupo on the Eighth Amendment conditions of confinement claims related his cell conditions and the lack of running water in his cell.

Defendants also seek summary judgment on Plaintiff's claim that Defendant Cupo denied him food on various occasions. The occasional deprivation of meals does not generally rise to the level of a constitutional violation. *See Zanders v. Ferko*, 439 F. App'x 158, 160 (3d Cir. 2011) (per curiam) (concluding that "the alleged deprivation of three meals over two days [to a diabetic inmate] fails to rise to the level of constitutional violation"); *see also Davis v. Miron*, 502 F. App'x 569, 570 (6th Cir. 2012) (per curiam) (denial of seven meals over six days did not rise to the level of an Eighth Amendment violation); *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (per curiam) ("The purported deprivation of a single meal is not of such magnitude as to rise to the

level of a constitutional violation").  Moreover, to demonstrate that the deprivation of food was sufficiently serious so as to deny life's necessities, Plaintiff must show there was a sustained failure to provide food in a sufficient quantity to maintain normal health.  *See, e.g.*, *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002).

In his deposition, Plaintiff testified that Defendant Cupo denied him food on occasion, but he provided confusing and contradictory testimony regarding the denial of food.  Plaintiff initially testified that he was not denied food altogether but was denied meals only on certain shifts.  Later in his deposition, however, Plaintiff appears to contend he was denied food for two days when he was housed in Cell 9 and went two days without food on approximately four occasions while housed in Cell 9.  Even if the Court credits the latter claim, Plaintiff's testimony is not sufficient to survive summary judgment where he has not asserted or offered any evidence showing that these deprivations affected his health in any way.  The Court grants summary judgment to Cupo and Collins on the conditions claim based on the deprivation of food.

The Court also grants summary judgment to Defendant D'Ilio on these conditions of confinement claims for lack of personal involvement.  "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3rd Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.*  There is no evidence that D'Ilio was personally aware of the alleged conditions in Plaintiff's cells.  Although Plaintiff contends that in October and November 2014, he filed several complaints with prison administration and the ombudsman concerning the conditions of his cell and 22 grievances in this time period, Plaintiff has not shown that D'Ilio reviewed or responded to his grievances.  Although Plaintiff claims that D'Ilio was on notice

through Plaintiff's complaints, such "[c]onclusory statements are insufficient to withstand summary judgment." *Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018). Accordingly, the Court grants summary judgment in favor of Defendant D'Ilio and dismisses the Eighth Amendment conditions of confinement claims against him.[22]

### 3. Retaliation Claims

Relying on the factual allegations in his FAC, Plaintiff also alleges that Patterson, Bundy, Anderson, Bell, Collins, and Cupo retaliated against him in violation of the First Amendment.[23] (FAC ¶¶ 130–134, 137–138.) The basis for the First Amendment retaliation claims against each Defendant is not explicitly set forth in the FAC (*see id.*), and Plaintiff has not filed an opposition brief to clarify his claims.

Defendants first argue that Plaintiff's First Amendment retaliation claims: 1) against Bundy, Patterson, and Anderson for filing false charges in December 2012, and 2) against Anderson for filing false charges in June 2014, are time barred because they occurred more than two years prior to Plaintiff's filing of this action. Plaintiff's disciplinary record shows that he was charged with possessing a weapon on or about December 3, 2012. (State Defs.' Ex. C, at 86.) On or about December 13, 2012, Plaintiff was found guilty and sentenced to 365 days in Ad-Seg and lost 365 days of commutation time. (*Id.*) Patterson also filed charges against Plaintiff on or about June 28, 2014, for "perpetrating a fraud" charges. (State Defs.' Ex. C, at 89.) On or about July 10, 2014, Plaintiff was found guilty and lost privileges. (*See id*.)

---

[22] Because the Court finds that State Defendants are entitled to summary judgment on the conditions of confinement claims, it need not address qualified immunity.

[23] Plaintiff also alleges that Anderno and Corsafulli retaliated against him, but these officers were not properly served and are not parties to State Defendants' Summary Judgment Motion. (*See* ECF No. 10; State Defs.' Br., at 5 n.2.) As such, the Court only considers the claims against Patterson, Bundy, Anderson, Bell, Collins, and Cupo.

"The length of the statute of limitations for a § 1983 claim is governed by the personal injury tort law of the state where the cause of action arose." *Kach v. Hose*, 589 F.3d 626, 634 (3d. Cir. 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)). The statute of limitations for personal injury claims in New Jersey is two years. *See* N.J. Stat. § 2A:14-2. Under federal law, the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *Kach*, 589 F.3d at 634 (quoting *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir. 1998)).

Here, Plaintiff presumably knew the charges were false when they were filed, and, thus, the claims accrued, and the limitations period began to run at the time the charges were filed. Plaintiff has not opposed the motion for summary judgment or provided any facts in support of tolling for these claims. Because Plaintiff filed his original complaint on September 30, 2016, more than two years after these retaliation claims accrued, the Court grants State Defendants' summary judgment and dismisses the First Amendment retaliation claim against Bundy, Patterson and Anderson arising from the alleged filing of false charges in December 2012 and June 2014.

The Court considers the remaining First Amendment retaliation claims on the merits. To survive summary judgment on a First Amendment retaliation claim, the plaintiff must show (1) that he engaged in constitutionally protected conduct; (2) he suffered an adverse action at the hands of the defendants; and (3) his constitutionally protected conduct was a substantial or motivating factor in the adverse action by the defendants. *Watson*, 834 F.3d at 422 (citing *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001)). Filing prison grievances is constitutionally protected conduct for purposes of a retaliation claim. *Id.* "An adverse action is one 'sufficient to deter a

person of ordinary firmness from exercising his First Amendment rights.'"[24]    *Id.* at 422, n.6 (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)) (internal quotation marks omitted). With respect to causation, a plaintiff can satisfy his burden through circumstantial evidence by showing: "1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; or 2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* There is "no bright line rule" limiting the time that may pass between protected speech and illegal retaliation. *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018); *see also Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 134 (3d Cir. 2017) (noting that temporarily proximity inference is usually in the order of days or weeks). "Where the temporal proximity is not so close as to be 'unduly suggestive,' the appropriate test is 'timing plus other evidence.'" *Watson*, 834 F.3d at 424 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). "[C]ausation, like any other fact, can be established from the evidence gleaned from the record as a whole." *Id.*

If the plaintiff meets these requirements, then the burden shifts to the defendant to prove by a preponderance of the evidence that he or she would have taken the same adverse action even if the plaintiff had not engaged in the protected activity. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). If the prison officials can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

---

[24] State Defendants argue that they are entitled to summary judgment with respect to Plaintiff's First Amendment retaliation claims because there is no evidence that Defendants' actions, even if true, deterred Plaintiff from exercising his constitutional rights. (State Defs.' Br., at 46.) The Court notes that the test for adverse action is not whether *this* Plaintiff would be deterred, but rather whether a prisoner of ordinary firmness would be deterred. *See Allah*, 229 F.3d at 225; *Banda v. Corniel*, 682 F. App'x 170, 174 (3d Cir. 2017) (whether the plaintiff "was actually deterred is immaterial" to determining whether he or she suffered an adverse action).

Based on his FAC and deposition testimony, Plaintiff alleges a First Amendment retaliation claim against Cupo and Collins for placing him in "the worst cells," but there is no evidence that Collins or Cupo retaliated against Plaintiff for his grievances or other First Amendment activity. Around November 27, 2014, after Plaintiff complained to the assistant ombudsman about the lack of running water in Cell 9, Collins and Cupo allegedly removed him from Cell 9 and placed him in Cell 34, which was located "all the way in the back of the tier." (FAC ¶ 44.) Plaintiff states only that Cell 34 was in the back of the tier and provides no evidence that placing him in that location was an adverse action that would deter a prisoner of ordinary firmness from exercising his First Amendment rights. Because a reasonable jury could not find that Collins and Cupo cell placements or transfers were retaliatory based on the record evidence, the Court grants summary judgment to Cupo and Collins on the First Amendment retaliation claims.

Plaintiff also contends in his FAC that Bundy, Patterson, Mallette, Bonanno, and Bell retaliated against him for exercising his First Amendment rights. These Defendants were involved in the December 24, 2014, cell search and/or extraction.[25] Years before the December 24, 2014, incident, Bundy allegedly told other officers that Plaintiff was a problem prisoner who filed grievances against corrections officers. (*Id*. ¶¶ 27–29.) Plaintiff also testified that Bundy "plac[ed] shanks in [his] cell," told him he was going to put him "in the morgue," and "harassed" Plaintiff

---

[25] State Defendants focus on the cell extraction and the resulting disciplinary charges Plaintiff received for allegedly assaulting Mallette with the pipe. Having reviewed Plaintiff's allegations and his deposition testimony, however, the Court concludes that Plaintiff does not allege or testify that State Defendants retaliated against him by using excessive force during the cell extraction and by charging him with assault with a dangerous weapon. Instead, Plaintiff's FAC and testimony appears to focus on the search of his cell, the planting of the shank, and the filing of disciplinary charges in connection with the cell search as acts of retaliation for his filing of grievances. Even if Plaintiff did contend that Patterson's use of pepper spray, the extraction teams' use of force, and the resulting disciplinary charges were retaliatory, the Court would find that there is an insufficient causal connection between this conduct and Plaintiff's filing of grievances.

by having officers search him.  (Pl. Dep. 87:17 to 88:13.)  Several weeks before the cell search and extraction, Patterson told Plaintiff if he wanted officers to do things for him, he should "stop being a problem and filing paperwork." (FAC ¶ 58.)  And on the day of the cell search, Bell told Plaintiff not to get comfortable because he would not be staying in his housing unit writing complaints against him or his co-workers.  (*Id*. ¶ 64.)  Plaintiff, however, did not testify in this deposition that Patterson and Bell made these alleged comments, and the Court declines to credit them.  Plaintiff did testify, however, that Bonanno, Patterson, and others conspired to plant the shank in his cell but conceded that he didn't personally hear the officers making an agreement and was only speculating.  (Pl. Dep. 89:21–25; 90:1–6.).

Based on the FAC and deposition testimony, the court liberally construes Plaintiff to claim that Bundy, Patterson, Mallette, Bonanno, and Bell retaliated against him by orchestrating a search of his cell, planting a shank in his cell, and writing false charges against him.  (Pl. Dep. 89:16–25; 90:1–6; 99:19–25; 100:1–3.)  From the outset, however, the Court does not credit Plaintiff's testimony that Patterson, Bonanno, Bundy or any other officers planted the shank in Plaintiff's cell because this testimony is mere speculation and not based on Plaintiff's personal knowledge.  *See* Fed. R. Evid. 602.  Moreover, in his January 9, 2015, disciplinary appeal, Plaintiff stated that the weapon found inside his cell was left by the previous inmate.  (*See* Zimmerman Decl., at 27.)  State Defendants do not admit they planted the shank, and there is no credible evidence that they did.  Nor is there any evidence to support Plaintiff's unfounded claim that these officers *conspired* to plant the shank and charge him with the resulting disciplinary infractions.  *See Klein v. Madison*, 374 F. Supp. 3d 389, 421 (E.D. Pa. 2019) (circumstantial evidence to support a civil rights conspiracy "may include that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the

agreement, the period of the conspiracy, or the object of the conspiracy"). Moreover, nothing in the record before the Court would permit a finding that either Bonanno, who found the shank, or Mallette, who participated in the cell extraction, were even aware of any prior grievances or complaints filed by Plaintiff. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196–97 (3d Cir. 2015) (noting that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted").

Because there is no evidence to support Plaintiff's claim that Patterson, Bonanno, or Bundy planted the shank during the cell search, the Court addresses whether the cell search, standing alone, is sufficient to constitute an adverse action. Cell searches are a routine part of prison life, *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984), but searches that constitute "calculated harassment unrelated to prison needs" are not permissible. *Id.* at 530; *see also Rosario v. Cook*, Civ. No. 22-866, 2024 WL 1077320, at *3 (M.D. Pa. Mar. 12, 2024) (same). A retaliatory search of a prisoner's cell and seizure of his legal papers or other property may be sufficient to meet the adverse action prong for a First Amendment claim. *Humphrey v. Secretary Pennsylvania Department of Corrections*, 712 F. App'x 122, 125 (3d Cir. 2017) (citing *Bell v. Johnson*, 308 F.3d 594, 604 (6th Cir. 2002) (citing cases)). Here, however, there is no evidence that any State Defendants planted a weapon in his cell, as Plaintiff claims, or engaged in other misconduct during the search, such as seizing or destroying Plaintiff's property. As, such the Court finds that the mere search of Plaintiff's cell on December 24, 2014, is not sufficient to constitute an adverse action.

Plaintiff also appears to claim that the disciplinary charges arising from the cell search were filed against him in retaliation for his grievances. Disciplinary charges can constitute an adverse

47

action, as they have more than *de minimis* consequences. *See Watson*, 834 F.3d at 423. The Third Circuit has observed, however, that "most prisoners' retaliation claims will fail if the misconduct charges are supported by the evidence." *Id.* at 425 (citing *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002)). Here, Plaintiff admits that the unauthorized medication belonged to him but denies that the shank belonged to him. Nevertheless, the record evidence shows that Bonanno recovered the shank hidden under the lip of the toilet in Plaintiff's cell.

The facts in this case are also distinguishable from the facts in *Watson*, where the infraction at issue was minor and there was other evidence suggesting that one of the defendants issued a misconduct charge in retaliation for the plaintiff's threat to file a grievance:

> Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in the same condition for more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.

*Id.* at 426. Here, in contrast, Plaintiff was charged with possession of contraband, which plainly threatens institutional safety. There is no evidence to suggest that Plaintiff would not have been charged if he had not filed so many grievances. Instead, the evidence shows that State Defendants sanctioned Plaintiff because he broke the institutional rules by having contraband, including a weapon, in his cell, and issued the charges in furtherance of legitimate penological goals. As such, even if a reasonable jury could find that the search of Plaintiff's cell and the resulting disciplinary charges were motivated in part by Plaintiff's filing of grievances, the same decision defense applies.

For all these reasons, the Court grants summary judgment to Bundy, Patterson, Mallette, Bonanno, and Bell on the claim that they retaliated against Plaintiff by planting the shank in his cell during a cell search and charged him with the disciplinary infractions for possessing contraband.

Finally, Plaintiff also claims that Anderson filed false charges against him in retaliation for his complaints to the ombudsman that the water had been turned off in Cell 32. (FAC ¶¶ 102–108.) State Defendants argue that Plaintiff's retaliation claims against Anderson should be dismissed because there is no evidence of improper motive in the filing of disciplinary charges against Plaintiff. (State Defs.' Br., at 48.) Here, the Court disagrees.

The record evidence shows that Plaintiff complained to the ombudsman for several weeks that the water in his cell was turned off. Plaintiff testified that when Anderson removed Plaintiff from his cell to check the water, the water in his cell was off, but when Plaintiff returned to the cell, the water was turned on. Anderson immediately wrote a disciplinary charge against Plaintiff for lying. Viewing the record as a whole, the "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" coupled with Plaintiff's testimony that the water was off when Anderson removed him from his cell but was turned back on when Plaintiff returned to his cell is enough to avoid summary judgment on the retaliation claim against Anderson. From this evidence, a reasonable jury could find that Anderson knew about Plaintiff's complaints to the ombudsman, turned the water back on after removing Plaintiff from his cell, and falsely charged Plaintiff with lying in retaliation for his complaints to the ombudsman.

State Defendants also argue that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Plaintiff from bringing a retaliation claim unless and until his disciplinary charges have been overturned.[26] (State Defs.' Br., at 52.)  "The favorable termination rule in *Heck* applies only where prison disciplinary outcomes implicate the fact or duration of a prisoner's confinement.  *Davis v. Eberling*, 742 F. App'x 592, 595–96 (3d Cir. 2018) (citing *Muhammad v. Close*, 540 U.S. 749, 751 (2004)).  The parties dispute whether Plaintiff was found guilty of the lying charge, but this dispute is not material to the Court's analysis.  Even if Plaintiff were guilty, he received a verbal warning and no loss of commutation time for the relevant charge.  Therefore, *Heck* does not bar Plaintiff's retaliation claim against Defendant Anderson in connection with the lying charge.

Finally, State Defendants seek qualified immunity on behalf of Anderson, relying on *Watson*.  (State Def's Br., at 52.)  The Court, however, has determined that the timing of Plaintiff's complaints about the water being shut off combined with other evidence are sufficient for a jury to find in Plaintiff's favor.  Therefore, Anderson is not entitled to qualified immunity.

For these reasons, the Court denies summary judgment and qualified immunity on the First Amendment retaliation claim against Defendant Anderson.

### 4.  State Law Claims

Plaintiff brings state law negligence claims against D'Ilio, Collins, and Cupo, (FAC ¶¶ 140, 142–43.)  Plaintiff contends that D'Ilio was negligent for failing to take appropriate measures to ensure that Plaintiff was placed in adequate living conditions.  (*Id*. ¶ 140.)  Plaintiff alleges that Collins and Cupo failed to take appropriate measures to ensure that he was not exposed to mold

---

[26] Although the Third Circuit has held that dismissed charges are insufficient to deter a reasonable person from exercising his constitutional rights, *see Brightwell v. Lehman*, 637 F.3d 187, 190 (3d Cir. 2011), there is a factual dispute over whether the charges were dismissed, and State Defendants have provided evidence showing that the charges were upheld.

and mildew. (*Id.* ¶¶142–43.)   In addition, Plaintiff brings assault and battery claims against Patterson for "striking and unnecessarily using a chemical agent." (*Id.* ¶ 144.) Plaintiff also asserts assault and battery claims against Mallette, Collins, and Bell for striking him.  (*Id.* ¶¶ 145–47.) Finally, Plaintiff brings intentional infliction of emotional distress claims against Collins, Cupo, and Anderson by forcing Plaintiff to reside in a cell under "abhorrent living conditions." (*Id.* ¶¶ 149–52.)

State Defendants move for summary judgment on Plaintiff's state law claims because he did not timely file a notice of tort claim as required by New Jersey's Tort Claims Act ("NJTCA"). (State Defs.' Br., at 52.)  Pursuant to the NJTCA, "[n]o action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."  N.J. Stat. § 59:8-3.

> A claim for damage or injury arising under this act against the State shall be filed either with (1) the Attorney General or (2) the department or agency involved in the alleged wrongful act or omission. A claim for injury or damages arising under this act against a local public entity shall be filed with that entity.

N.J. Stat. § 59:8-7.

A claim must be presented under the Act "not later than the 90th day after accrual of the cause of action.  After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law."  N.J. Stat. § 59:8-8.  "The accrual date of a claim is the date on which the alleged tort is committed or the negligent action or omission occurred."  *Geissler v. City of Atlantic City*, 198 F. Supp. 3d 389, 400 (D.N.J. 2016).  If the claim was not filed within 90 days of accrual, a claimant is forever barred from recovering against a public entity or public employee, except as otherwise provided in N.J. Stat. § 59:8-9.  N.J. Stat. § 59:8-8(a).

Under N.J. Stat. § 59:8-9, a claimant may be permitted to file a late notice of claim in the discretion of a judge of the Superior Court, within one year after accrual of the claim, provided that the public entity or public employee has not been substantially prejudiced. "[I]n no event may any suit against a public entity or a public employee arising under this act be filed later than two years from the time of the accrual of the claim." *Id.*

Plaintiff's state law claims arise from events that occurred between mid-September 2014 and early February 2015.[27] The record provided by Defendants reflects that Plaintiff's Notice of Tort Claim was received on March 1, 2016, more than a year after the last of the relevant events, and the State of New Jersey, Department of the Treasury, Division of Risk Management rejected it as filed outside the 90-day window for filing a Notice of Claim. (ECF No. 138-5, Ex. E at 102.) The letter also provided Plaintiff with instructions for filing a late claim. Although there is evidence that Plaintiff filed a certification in support of a late Notice of Claim, he concedes in that certification that he submitted his Notice of Claim on February 28, 2016, at the earliest. (ECF No. 138-5, Ex. E at 104–05.) There is nothing in the record to suggest that the state court granted Plaintiff's request to submit a late Notice of Claim.

Here, Plaintiff did not meet the 90-day filing deadline and is not entitled to an extension because he failed to file a late notice within one year of the accrual of his claims. *See* N.J. Stat.

---

[27] In mid-September 2014, Plaintiff complained about mold and mildew in his cell. (FAC ¶ 33.) In October and November 2014, Plaintiff filed several complaints, and on November 16 or 17, 2014, Plaintiff alleged he became violently ill due to prison conditions. (*Id.* ¶¶ 34–38.) From November 30, 2014 to December 15, 2014, Plaintiff claimed he complained to prison administration about the incident. (*Id.* ¶ 45.) On December 24, 2014, Plaintiff claims he was assaulted by State Defendants. (*Id.* ¶¶ 74–80.) On January 20, 2015, Plaintiff suffered an electric shock from the shower. (*Id.* ¶ 91) In late January 2015, Plaintiff was placed back on 7-Wing to the unit supervised by Collins and Cupo where he alleged did not have water in his cell for three weeks. (*Id.* ¶¶ 102–05.)

§ 59:8-9.  The Court grants State Defendant's motion for summary judgment on Plaintiff's state law claims for failure to file a Notice of Claim within the statutory period.

### b.  Medical Defendants' Motion for Summary Judgment

The Supreme Court first held in *Estelle v. Gamble* that the Cruel and Unusual Punishments Clause prohibits government officials from exhibiting "deliberate indifference to [the] serious medical needs of prisoners."  429 U.S. 97, 104–05 (1976).  To survive summary judgment, on an Eighth Amendment medical claim, Plaintiff's evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  Defendants do not dispute for purposes of this motion that Plaintiff's respiratory problems on December 24, 2014, constituted a serious medical need.  At issue then is whether Nurse Rakoczy acted with deliberate indifference.

Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law."  *Natale v. Camden Cnty. Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000)).  "[F]inding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'"  *Id.* (quoting *Farmer*, 511 U.S. at 837).  That is, the defendant must be "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference."  *Id.* (cleaned up).  In claims for inadequate medical care, the Third Circuit has "found deliberate indifference in situations where there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence."  *Id.* (quoting *Nicini*, 212 F.3d at 815 n.14).

Both inadequate medical care and its outright denial can support a deliberate indifference claim, but the proof to sustain each type of claim is different.  *See Pearson v. Prison Health Serv.*,

850 F.3d 526, 535 (3d Cir. 2017).  When some care is provided, the treatment is presumptively proper "absent evidence that it violates professional standards of care." *Id.*  As such, an inadequate care claim requires objective evidence that "the particular treatment or diagnosis fell below a professional standard of care." *Id.* at 536.  When the adequacy of care "would not be obvious to a layperson," expert medical testimony is required.  *Id.*; *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").  Otherwise, "other forms of extrinsic proof may suffice." *Pearson*, 850 F.3d at 535.  In contrast, when care is delayed or denied, such extrinsic proof is unnecessary. *Id.*  In either case, mere negligence is not enough. *Id.* at 537.

In *Natale*, for example, the prisoner-plaintiff testified that he informed a prison employee that that he was an insulin-dependent diabetic, which the employee noted in his chart, and the plaintiff also had a note from a physician indicating that he "must have insulin." 318 F.3d at 582. The Third Circuit held that "[a] reasonable jury could conclude that [the defendant] knew that Natale was an insulin-dependent diabetic and that if insulin was not administered as required, he would suffer adverse health consequences." *Id.*

In *Pearson*, the Third Circuit found that there were triable issues of fact as to whether a nurse was deliberately indifferent where he "(1) refused to examine [the plaintiff] in his cell when the block officer first called medical, (2) forced him to crawl to the wheelchair to obtain medical treatment, and (3) did nothing but order him placed in the infirmary overnight despite recognizing signs of appendicitis." 850 F.3d at 540. The Third Circuit determined that the nurse's failure to examine the plaintiff when he initially requested medical assistance created a triable issue as to whether the nurse denied reasonable requests for medical treatment or delayed necessary medical treatment for non-medical reasons. *Id.*  The Third Circuit also considered the fact that the plaintiff

was not being treated by another physician. *Id.* The circuit court emphasized that the nurse had received a report from corrections officer that the plaintiff was suffering from excruciating pain, that the plaintiff had twice sought medical assistance earlier in the day, and that he had reported the same complaint but with increasing severity. *Id.*

Here, it is undisputed that Nurse Berg treated and stabilized Plaintiff prior to his interactions with Rakoczy. Plaintiff testified, however, that his breathing difficulties returned within the hour. As such, Medical Defendants cannot claim (*see* Medical Defs.' Br., at 15) that Nurse Berg's initial treatment obviated the need for Rakoczy to provide additional medical care to Plaintiff. Plaintiff further testified that he repeatedly complained to Rakoczy that he could not breathe, but Rakoczy, like the nurse in *Pearson*, did not assess him or provide him with any treatment. Plaintiff further testified that Rakoczy, who was not accompanied by any other medical staff, also told Plaintiff not to die on his shift, and left Plaintiff alone for over three and a half hours. Although State Defendants contend that Rakoczy medically assessed Plaintiff and provided him with an inhaler, Plaintiff testified that Rakoczy did not perform an assessment or provide him with an inhaler. As such, whether Rakoczy provided Plaintiff with any meaningful medical treatment for his serious medical needs is disputed and cannot be resolved at summary judgment. Moreover, Rakoczy alleged statement, "I don't have time for this shit," could also lead a jury to conclude that his denial of care was motivated by non-medical factors—*i.e.* that he was too busy to attend to Plaintiff's medical needs. *See id.* at 537.

In sum, a reasonable jury could credit Plaintiff's account and find that it was obvious that he, an asthmatic, faced a substantial risk of serious harm due to his breathing difficulties, and that Rakoczy, a medical professional, drew that inference. Moreover, a reasonable jury could find that it was obvious that Rakoczy's conduct in failing to provide any treatment and leaving Plaintiff to

suffer for three and a half hours fell well below a professional standard of care and amounted to deliberate indifference.  Alternately, a jury could find that Rakoczy acted with deliberate indifference by denying Plaintiff treatment for a nonmedical reason.  Therefore, the Court denies summary judgment as to Rakoczy on the Eighth Amendment deliberate indifference claim.

The Court, however, will grant summary judgment to Defendant Ahsan.  As alluded to above, in cases where a prisoner challenges the adequacy of his medical care, "mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation." *Id.* at 535.  "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).  Indeed, "[d]eference is given to prison medical authorities in the diagnosis and treatment of patients, and courts 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment.'" *Id.* at 228 (second and third alterations in original) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).  Accordingly, a "prison doctor['ˈ]s professional judgment . . . will be presumed valid 'unless it is such a substantial departure from professional judgment, practice or standards as to demonstrate that the doctor did not base the decision on such a judgment.'" *Soto-Muniz v. Martin*, 665 F. App'x 226, 228 (3d Cir. 2016) (quoting *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990)).

Here, there is no dispute that Plaintiff was shocked or electrocuted in the shower on January 20, 2015, and received medical treatment that included a physical examination, an EKG, and admission to the infirmary for observation and treatment.  Moreover, it is undisputed that Ahsan consulted with the nurses and fully reviewed Plaintiff's chart and medical records prior to

discharging him with a referral to see a specialist. Although Plaintiff testified that he still needed medical care, he does not specify that he was seeking any particular treatment and merely wanted to show his burns to Ahsan and tell Ahsan his back hurt.

Plaintiff's chief complaint appears to be that Ahsan did not personally examine him prior to discharging him. In light of the evidence that Plaintiff received substantial medical care for his injuries and the lack of evidence showing that Ahsan did not exercise professional judgment in his decision to discharge Plaintiff, the Court will grant summary judgment to Defendant Ahsan on the Eighth Amendment deliberate indifference claim.

### c. The Unserved and John Doe Defendants

Summons were returned unexecuted against Defendants Grundy, Jackson, Corsafulli, and Anderno. (*See* ECF Nos. 10, 94, 99.) Accordingly, the Court notifies Plaintiff that within thirty days it intends to dismiss the FAC as to these Defendants for failure to serve pursuant to Fed. R. Civ. P. 4m. The Court shall dismiss all unserved Defendants within 30 days if Plaintiff fails to respond and provide good cause for his failure to serve them. The Court will also dismiss all John Doe Defendants, which Plaintiff has neither identified nor served, within 30 days.

### IV.    <u>CONCLUSION</u>

For the reasons above, the Court grants in part and denies in part State Defendants' Motion for Summary Judgment. The Court **denies** summary judgment on the Eighth Amendment excessive force and failure to intervene claims against Patterson, Mallette, Bell, and Collins. The Court also **denies** summary judgment on the First Amendment retaliation claim against Defendant Anderson arising from the disciplinary charges he filed against Plaintiff in February 2015. The Court also **denies** qualified immunity on the surviving claims. The Court otherwise **grants** State Defendants' Motion for Summary Judgment.

As to the Medical Defendants Motion for Summary Judgment, the Court **denies** summary judgment as to the Eighth Amendment deliberate indifference claims against Defendant Rakoczy and **grants** summary judgment on the Eighth Amendment deliberate indifference claims against Defendant Ahsan.  Plaintiff is notified that the Court intends to dismiss the unserved Defendants and John Does within 30 days if Plaintiff fails to respond and provide good cause for his failure to serve them.  The Court refers this matter to the Magistrate Judge for settlement and directs the Clerk to administratively terminate the case pending the outcome of those discussions.  An appropriate Order follows.

Date: June 23, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**